Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 20, 2003        Decided June 17, 2003

No. 01-3016

UNITED STATES OF AMERICA,
APPELLEE

v.

ERIC SEAN REDMAN, A/K/A ERIC REDMOND,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cr00198–01)

———

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for the appellant. *A.J. Kramer*, Federal Public Defender, was on brief.

*Patricia A. Heffernan*, Assistant United States Attorney, argued the cause for the appellee. *Roscoe C. Howard, Jr.*, United States Attorney, and *John R. Fisher* and *Roy W.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*McLeese III*, Assistant United States Attorneys, were on brief.

Before: HENDERSON and TATEL, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Eric Sean Redman (Redman) appeals the district court's denial of his motion to suppress evidence, asserting that the police search incident to his arrest violated the Fourth Amendment to the United States Constitution. As explained below, we conclude that Redman waived his challenge to the protective sweep and, accordingly, we dismiss his appeal.

I.

Redman entered a conditional guilty plea, *see* FED. R. CRIM. P. 11(a)(2), to one count each of unlawful possession with intent to distribute five grams or more of cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) (2000); unlawful possession of a firearm during a drug trafficking offense, 18 U.S.C. § 924(c) (2000), aggravated assault, 22 D.C. CODE § 504.1 (Michie 1981), attempted assault with a dangerous weapon, 22 D.C. CODE §§ 502, 103 (Michie 1981), attempted kidnapping, 22 D.C. CODE §§ 2101, 103 (Michie 1981 & Supp. 2001) and attempted first degree sexual abuse, 22 D.C. CODE §§ 4102, 4118 (Michie 1981 & Supp. 2001). The evidence sought to be suppressed was seized when the District of Columbia Joint Fugitive Task Force (Task Force) executed a warrant for his arrest at his apartment in the early morning of May 1, 2000; the District of Columbia Metropolitan Police Department (MPD) subsequently obtained a warrant to search the premises.

According to the testimony of government witnesses, four FBI agents (members of the Task Force) executed the arrest warrant. The agents arrived at the apartment at 6:30 a.m. that day. Three agents stationed themselves at the front and one at the rear of the building. One of the three at the front knocked on the apartment door and announced, "Police, open

the door," but received no response. When the agents threatened to forcibly enter the apartment after waiting some ten to fifteen minutes, Redman opened the door, put his hands on his head and surrendered. During the ten to fifteen minute interval, the agent in the rear saw someone briefly peer out of the window of the apartment.

The agents entered the apartment and saw two female teenagers on a couch in the living room adjacent to the entry. The agents told them not to move and the women complied. In plain sight on a window ledge in the living room was a cigar box that contained "green baggies" and what appeared to be marijuana. On a table in the living room, the agents saw another cigar box containing another green bag.

After they secured the two women, the agents searched the apartment for other individuals. They looked in a hall closet ten feet from where Redman was being held and found a rifle leaning against the wall and metal ammunition boxes on the floor. In a bedroom across from the closet, they saw a knife on a dresser and in the bedroom closet saw $900 in U.S. currency. They also checked the bathroom but saw nothing there. The agents secured the apartment and called MPD Detective Jackson to investigate the scene. Before Jackson arrived, one of the two females asked to use the bathroom. An agent searched the bathroom for weapons before allowing her to enter and discovered a shotgun in the bathroom linen closet. The agents then noticed the barrel of a .22 caliber revolver protruding from a duffel bag on the floor near the front door.

Detective Jackson arrived at the apartment between 8:15 and 8:30 a.m. and, learning of the five items observed by the Task Force—the green baggies, the .22 revolver in the duffel bag by the front door, the rifle in the hall closet, the shotgun in the bathroom linen closet and the currency—called a MPD mobile crime unit to the scene to process the evidence. The two females were still at the scene (Redman in the meantime had been transported to jail by the Task Force) and remained there while the mobile crime unit began processing the items discovered by the Task Force. Jackson then decided that the

two should be taken to the MPD Seventh District headquarters for questioning. One of them needed additional clothing so Jackson allowed her to retrieve clothes from the bedroom, escorted by a female crime scene technician and him. As the female picked up some clothes, Jackson saw a clear plastic package containing what appeared to be a white rock on the floor. Jackson also saw on the floor a round of ammunition of a type not utilized by the weapons disovered by the FBI. At that point, Jackson ordered everyone on the scene to stop working, commanded that no one was to search the apartment further and then secured the premises to obtain a search warrant. Jackson posted a uniformed officer in the apartment and ordered everyone else to leave the scene sometime between 9:30 and 10:00 a.m.

Jackson and another MPD officer returned about 3:00 p.m. with a search warrant and began a search of the premises. They discovered a .16 gauge shotgun in the bedroom closet, a .12 gauge shotgun behind headboard in the bedroom, and a 7.62 millimeter assault rifle, a 9 millimeter handgun and about $7,000 in U.S. currency in a dresser drawer in the bedroom. In a plumbing access located in the wall between the bedroom and the bathroom they found a plastic packet of white rock and a magazine for the assault rifle and, in a jogging suit in the bedroom, they found another plastic package with two smaller packets, each containing a white rock-like substance. The two officers also discovered in the bedroom what Jackson described as a "radio code list," used, Jackson testified, to communicate in code via hand held radios.

Redman filed a Motion to Suppress Tangible Evidence on September 7, 2000. In it, Redman challenged the Task Force's initial protective sweep that uncovered the green baggies, the rifle, the $900, the shotgun from the bathroom linen closet and the .22 caliber revolver. Motion to Suppress Tangible Evidence, *United States v. Redman*, Crim. No. 00–0198 (filed Sept. 7, 2000). Redman argued that the search the Task Force conducted incident to his arrest went beyond the protective sweep permitted by *Maryland v. Buie*, 494 U.S. 325 (1990), because it extended beyond the doorway where Redman was arrested and lasted past Redman's sei-

zure. Motion to Suppress Tangible Evidence at 5–6. Furthermore, Redman claimed, because there was no indication that the arresting officers feared the two females found in the apartment, the officers should not have conducted a protective sweep under *Buie* once they effected Redman's arrest. *Id.* at 6. Redman's motion sought the suppression of the five items discovered during the sweep along with the later discovered evidence because the latter constituted "fruit of the poisonous tree." *Id.* at 9–10.

At the suppression hearing, the court cautioned Redman's counsel that his questioning of a government witnesses went beyond the scope of the hearing, noting, "[t]he scope of this hearing is to find out whether this was a legitimate protective search." 9/12/2000 Tr. 99. Following the witnesses' testimony, however, Redman changed the theory of his challenge. Instead of seeking to suppress the five items discovered during the Task Force's sweep, Redman argued that the items Detective Jackson later seized pursuant to the search warrant should be suppressed. The thrust of Redman's new argument was the alleged inconsistency between Jackson's testimony and that of Redman's witness, Lakeeshia Pendarvis, one of the females in the apartment when Redman was arrested. Pendarvis testified that the officers at some point placed *two* handguns on the living room table in front of the couch where she sat whereas, according to Jackson, only *one* handgun was found while the two females were there and it was placed on the dining room table. The discrepancy, Redman said, cast doubt on Jackson's claim that certain evidence, including one of the two handguns (the 9 millimeter), was not found until the search warrant was executed. Redman insisted that because there were only two handguns found in the apartment—the .22 caliber revolver from the duffel bag and the 9 millimeter from the bedroom dresser—one of the two guns Pendarvis saw the police place on the living room table that morning—hours before the search warrant was executed—had to have been the 9 millimeter. And because, according to Redman, the 9 millimeter had to have been discovered *before* the search conducted pursuant to the warrant, and because no government witness testified

when the evidence seized with the 9 millimeter was found, "it [was] at least unclear . . . that these other items were found" during the search pursuant to the warrant; therefore "the [ ]9 millimeter handgun, the monies found in the dresser drawer in the back bedroom, the shotgun, which was found in the back bedroom after having allegedly removed the bedpost from the front of the radiator, as well as the narcotics, which were allegedly found in the back room, should be suppressed." *Id.* at 177–78, 195–96. Redman's counsel began by stating that

> in order to make a determination of whether or not it is appropriate to suppress this evidence, we must make our analysis in light of *Bowie* [sic] to determine whether or not the evidence that is elicited or secured, ostensibly under the protective sweep, is appropriately admitted in this case, and I would represent that it is not.

*Id.* at 169. That evidence, he maintained, had to be suppressed because officers had conducted a full-blown warrantless search—not simply a protective sweep—that uncovered the 9 millimeter and other evidence. In fact, Redman summed up thus:

> I will not endeavor to argue that the other five items that were revealed during the protective sweep were found in violation of the Fourth Amendment, but . . . would submit that the [ ]9 millimeter handgun [and other evidence from the bedroom] should be suppressed as violative of the Fourth Amendment.

*Id.* at 177–78.

Both the court and the government expressly noted the shift in Redman's position. The court stated that it had "thought that there was one thrust to the motion, . . . that the protective sweep was improper. . . . [It] appreciate[d] that [Redman's counsel] did not argue that, because [it thought] the testimony was very clear on that, very straightforward, and very credible," *id.* at 178, and the prosecutor stated "I now take it that there is no challenge" to the sweep, *id.* at

183. Redman said nothing to correct the court's and the government's interpretation of his argument. The district court then denied Redman's motion to suppress, concluding that "the shotgun in the closet, the substantial amount of cash, and the [ ]9 millimeter gun, a second shotgun, . . . were found in places where they would not be seen in a proper protective search" and "[t]hey were all items that were found by Detective Jackson and Officer Costello subject to the search warrant." *Id.* at 202. The court rejected Pendarvis's testimony, finding that it was "not reliable for a number of reasons." *Id.* Redman then entered his conditional plea of guilty and appealed.

## II.

While Redman asserts on appeal that the district court erred in denying his suppression motion, his challenge is not the one he mounted at the hearing; instead he resurrects the challenge he had originally made, namely that the sweep conducted by the Task Force exceeded the limits of *Maryland v. Buie* because it went beyond the entryway and continued after Redman had been apprehended. Quoting *Buie*, Redman explains that two sorts of sweeps incident to an arrest are permissible: "The first involves 'look[ing] in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.' The second goes 'beyond that,' but is nevertheless circumscribed" to spaces where individuals might hide, and is lawful only if based on " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.' " *United States v. Ford*, 56 F.3d 265, 268–69 (D.C. Cir. 1995) (quoting *Buie*, 494 U.S. at 334) (alteration in original) (footnote omitted). He argues that the search conducted when he was arrested qualifies as neither because it extended to the hallway and bedroom—too distant from the entryway where Redman surrendered to qualify as the first kind—and because the officers could not reasonably have

believed the two young females posed the type of threat supporting the second kind.

Although the government denies that the sweep the Task Force conducted was improper under *Buie*, it first asserts that Redman waived his challenge to the Task Force sweep because he withdrew that challenge at the suppression hearing. *See* FED R. CRIM. P. 12(b); *United States v. Mitchell*, 951 F.2d 1291, 1296–97 (D.C. Cir. 1991) (appellant waived challenge to search on appeal based on ground that search was conducted without warrant because appellant's ground for suppression in district court was different, namely no probable cause), *cert. denied*, 504 U.S. 924 (1992); *see also United States v. Weathers*, 186 F.3d 948, 952 (D.C. Cir. 1999) ("unless cause is shown, [Rule 12(b) claims] may not later be resurrected on appeal" (internal quotations omitted)), *cert. denied*, 529 U.S. 1005 (2000). We agree with the government.

Rule 12(b) of the Federal Rules of Criminal Procedure requires that a motion to suppress evidence must be made before trial and Rule 12(f) mandates that the failure to make such an objection "shall constitute waiver thereof."[1] Waiver not only plainly applies to an unmade pre-trial objection but also to an objection initially made but subsequently with-

---

[1] The applicable version of Rule 12(b) provided:

> (b) *Pretrial Motions*. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion . . . . The following must be raised prior to trial:
>
> . . . .
>
> (3) Motions to suppress evidence; . . . .

FED. R. CRIM. P. 12(b) (2002). The applicable form of Rule 12(f) stated, "Failure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof." FED. R. CRIM. P. 12(f) (2002). Rule 12 was amended effective December 1, 2002 but the amendment does not affect the outcome of this appeal. FED. R. CRIM. P. 12 advisory comm. note. Rule 12(b)(3) is now included, unchanged, in Rule 12(b)(3)(C) and the waiver language of Rule 12(f) is now contained in Rule 12(e). FED. R. CRIM. P. 12(b)(3)(C), (e) (2003).

drawn or abandoned. *E.g.*, *United States v. Sheppard*, 149 F.3d 458, 461 (6th Cir. 1998) (defendant waived suppression motion when he withdrew motion and never renewed it). Based on Redman's counsel's statement at the suppression hearing as well as the court's and the prosecution's response to it, we conclude that Redman at that time withdrew his challenge to the protective sweep. Redman does not dispute that he altered the thrust of his argument at the hearing but does dispute that his counsel's statements constituted a withdrawal of his challenge. Instead, according to Redman, those statements should be interpreted as a "choice not to embellish on his written suppression arguments." Reply Brief of Appellant at 4. Redman asserts that his counsel's most damaging statement, "I will not endeavor to argue that the other five items that were revealed during the protective sweep were found in violation of the Fourth Amendment," 9/12/2000 Tr. 177, did not "explicitly" withdraw his motion. Reply Brief of Appellant at 4. Moreover, neither the district court nor the prosecution viewed it as a withdrawal and hence a waiver of his argument.

According to Redman, when the court stated, in response to his argument, that it "appreciate[d] that [Redman's counsel] did not argue [the protective sweep challenge] because the testimony was very clear on that, very straightforward," 9/12/2000 Tr. 178–79, it meant only that Redman had wisely opted not to belabor a losing argument, not that he did not intend to preserve the argument. Redman relies on the fact that the court made several factual findings relevant only to the *Buie* sweep and ultimately issued a general ruling ("there are no grounds to suppress the tangible evidence under the Fourth Amendment or any other provision of the Constitution," *id.* at 203) which denied both the post-sweep challenge articulated at the hearing *and* the initial sweep challenge made by motion. Furthermore, Redman asserts, we cannot construe the prosecutor's statement "I now take it that there is no challenge" to the protective sweep, *id.* at 183, as a recognition of Redman's intent to withdraw his motion directed at the sweep because the prosecutor then went on to

defend the Task Force sweep on the merits. We reject Redman's rewrite of the suppression hearing.

Redman's counsel's statement that "I will not endeavor to argue that the other five items that were revealed during the protective sweep were found in violation of the Fourth Amendment" plainly meant that Redman withdrew his challenge to the Task Force's protective sweep. Although Redman's counsel did not expressly declare "I withdraw my written motion," his language nonetheless manifested that Redman was abandoning his challenge to the sweep. Indeed, if Redman meant only to convey his intention to rest on his written motion without argument, he would have demurred when the court noted the "thrust of this challenge had to do with the sweep . . . [and it] appreciated Redman did not argue that" and the prosecutor said "I now take it that there is no challenge."[2]

Furthermore, the district court's ruling did not, as Redman contends, include Redman's written motion.[3] Although the

---

[2] Our conclusion is also bolstered by Redman's counsel's insistence at Redman's subsequent plea that:

> it was important to Mr. Redman that this matter be resolved by a conditional plea, because it is still his contention that, in fact, the items that were found in the back bedroom, i.e., the [ ]9 millimeter hand gun, the shot gun, which was alleged to have been found in the dresser, the money, the crack cocaine that Detective Jackson alleges were found subsequent to the secure [sic] of a search warrant were, in fact, found before that search warrant was secured, and as such should have been suppressed by way of the motion, or the defense motion for suppression.

9/22/2000 Tr. 17 (Plea Hearing). Significantly, Redman's counsel omitted the five items discovered during the protective sweep.

[3] For this reason we also reject Redman's assertion that we may reach the merits of the protective sweep even if he withdrew his challenge thereto because the district court "passed on" the objection he asserts here. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (review of issue not pressed can be undertaken so long as lower court passed on it). But the trial court did not pass on it.

lower court made factual findings relevant to the sweep, namely that the Task Force "had real reason to be concerned about their safety" and that there was "convincing evidence of the good faith of their sweep," *id.* at 198–99, those findings were simply part of the district court's dissection of the various law enforcement officers' sequential discoveries—the initial protective sweep, Jackson's discovery when he accompanied one of the females to the bedroom and the later, and final, search pursuant to the warrant. The district court viewed the only remaining aspect of Redman's motion to be whether the 9 millimeter and other evidence claimed to have been seized pursuant to the search warrant were in fact seized earlier—the court even stated, "The only question that has been raised at all in this entire scenario is the testimony by Ms. Pendarvis about seeing at some point two revolvers on a table." *Id.* at 202. That question was relevant only to the challenge Redman made at the hearing, not the one in his written motion.[4]

For the foregoing reasons, we conclude that Redman withdrew his challenge to the protective sweep and under FED. R. CRIM. P. 12 his challenge is therefore waived. Accordingly, the appeal is dismissed.

*So ordered.*

---

[4] Likewise, the prosecutor's remark that "I now take it that there is no challenge," 9/12/2000 Tr. 183, manifested his understanding that Redman's objection to the sweep was withdrawn notwithstanding the prosecutor's unprompted defense of the sweep as legal. His statement that the five items discovered by the Task Force were "the product of a lawful protective sweep," *id.* at 190, was intended only as part of his argument that both the Task Force and the MPD were careful to limit the scope of their warrantless searches—a contention aimed at Redman's argument made at the hearing.